# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

WILLIAM LAMONT GREEN, # 470814,   )
                                     )
     **Petitioner,**                  )
                                       )
**v.**                                  )     **No. 3:15-cv-00223**
                                     )
**CHRISTOPHER BRUN,**         )     **Judge Trauger**
                                     )
     **Respondent.**                )

## <u>MEMORANDUM OPINION AND ORDER</u>

Petitioner William Green brought this 28 U.S.C. § 2254 petition for writ of habeas corpus challenging his custody pursuant to a 2010 conviction for second-degree murder in Davidson County, Tennessee. (Doc. No. 1). He has since filed an amended petition (Doc. No. 55), which is the operative petition in this action. As explained below, the petitioner is not entitled to habeas corpus relief, so the petition will be denied, and this action will be dismissed.

### I.        Procedural and Factual Background

### A.  Pretrial, Trial, and Sentencing Proceedings

The Tennessee Court of Criminal Appeals summarized the petitioner's trial proceedings as follows:

> The defendant's conviction in this case relates to the shooting death of the victim, Marvin Allen Ivory, on March 2, 2007. At trial, the victim's sister, Bobbie Ivory, testified that on March 2, 2007, she had gone to a neighborhood store with two cousins when she saw the defendant, whom she knew as "Little Green," exit a green Thunderbird while talking on a cellular telephone. Ms. Ivory said that the defendant told the person to whom he was speaking that "he needed a gun because this n* * * * * had just got [his] money."
>
> Ms. Ivory and her companions left the market while the defendant was still in the store, and they returned to Ms. Ivory's mother's residence. At approximately 9:30 p.m., the victim and Tyrez Jones pulled into the driveway in a silver truck and then immediately "pulled back off." Approximately half an hour later, Ms. Ivory was

1

prompted to look out the window by barking dogs. She saw the victim's apparently driverless silver truck roll backward into a house. Ms. Ivory and her mother went to investigate and discovered that the victim was unconscious inside the locked truck. The women went to telephone police, and when they finally succeeded in rousing the victim, he told them that he had been shot in the back by "Little Green and Big Yo" because he "found $50.00 and [the defendant] said it was his." Ms. Ivory said that the victim was bleeding profusely from a gunshot wound to the "back part of his body."

Ms. Ivory said that emergency medical personnel "took so long" to arrive that she, her mother, and her cousins drove the victim to Nashville General Hospital at Meharry. From there, the victim was transferred to Vanderbilt Medical Center, where he died the following morning.

The victim's mother, Virginia Ivory, confirmed her daughter's testimony, noting that the victim told them that "Little Green and Big Yo" had shot him. The victim's cousin, April Ivory, confirmed that she and Bobbie Ivory saw the defendant and an individual she knew as "Big Yo" at the neighborhood market but said that she could not overhear the defendant's telephone conversation.

Another of the victim's cousins, Iris Murphy, testified that she was inside the neighborhood market when the defendant, whom she knew as "Little Green," entered the market talking on a cellular telephone. She said that the defendant "was saying he was upset because [the victim] supposed to of took his money and he was mad because he did not have his strap in." She stated that the defendant said he was going to shoot the victim the next time he saw the victim. Ms. Murphy said that after the defendant ended his telephone conversation, he turned to her and told her that he intended to shoot the victim because the victim had taken $50.00 "off the floor" that belonged to the defendant. Ms. Murphy said that she did not take the defendant's threats seriously, but she did telephone the victim and tell him what the defendant had said. She recalled that the victim did not take the threats seriously either. Later on that evening, she learned that the victim had been shot, and she went to her aunt's house immediately. There she heard the victim say that he had been shot by "Little Green and Big Yo."

Tyrez Johnson, the victim's companion on March 2, 2007, testified that he and the victim were "supposed to be going chilling at the hotel with some females," but the victim insisted on making a side trip to speak to "that bitch ass n* * * * * little Green." Mr. Johnson said that the victim told him that he had found $50.00 earlier in the day and that the defendant had claimed the money belonged to him. The victim drove to the defendant's mother's house and "pulled up kind of aggressive like, like something was fixin [sic] to happen." At that point, the victim and the defendant argued, with the victim being somewhat more aggressive than the defendant. Mr. Johnson said that he did not see a gun in the victim's possession but did see the defendant walk back to his car and arm himself with a handgun. At that point, the victim asked the defendant if he was "pistol playing" him, which Mr. Johnson explained to mean "showing the pistol period." The defendant then

2

shot the victim. Despite his wound, the victim was able to get back into his truck and drive away. Mr. Johnson ran away from the scene and returned to his house, where he went to sleep.

Cousins Temeka Crawford, Malika Riley, and Narkeetha Dillard went to the defendant's mother's house on March 2, 2007, to visit the defendant's nephew, Josh Green. Ms. Crawford recalled that while she was at the house, the defendant arrived and told the gathered teenagers that someone had stolen $50.00 from him and that he was "going to pop" the perpetrator. A short time later, the victim pulled up, the two men argued, and the defendant went to his car and armed himself with a handgun. Ms. Crawford heard the victim say, "[A]re you going to shoot me? I ain't scared of no gun." The defendant then shot the victim, and the victim got back into his truck and drove away. Ms. Dillard confirmed Ms. Crawford's version of events, and added that prior to the victim's arrival, the defendant displayed the firearm and said, "[H]e better not play with me I just bought this strap."

Doctor Amy R. McMaster, the medical examiner practicing for the same private company as the doctor who performed the autopsy of the victim, testified that the victim died from a single gunshot wound to his torso that "entered on the left lower abdomen and exited on the right hip." The bullet injured the blood vessels in the mesentery, which "is the supporting structure of the bowel," and the iliac vessels of the pelvic area. She said "unless [the victim] was shot while standing in a[n] emergency room that had the capability of repairing these wounds, these wounds are fatal wounds."

During cross-examination, Doctor McMaster testified that tests on the victim's blood "revealed the presence of ethanol which is alcohol, drinking alcohol. It revealed THC which is an active ingredient in marijuana. It also revealed cocaine and cocaine metabolites, cocaine metabolites is what your body turns cocaine into in the process of clearing it from the body."

Metropolitan Nashville Police Department Detective Danny Satterfield led the investigation into the victim's murder. He testified that "[t]here was no physical evidence that was located" at the scene of the shooting. After interviewing witnesses, he obtained a warrant for the defendant's arrest. The defendant reported to the police station later that same day and provided a videotaped statement to police. Detective Satterfield said that the defendant initially denied being present at the scene but later admitted shooting the victim and claimed he did so in self-defense. The defendant's videotaped statement was played for the jury.

At the conclusion of Detective Satterfield's testimony, the State rested.

The defendant's nephew, Joshua Green, testified on behalf of the defendant, that on March 2, 2007, the defendant told him that the victim had threatened the defendant. A short time later, the victim "pulled up aggressively" in his truck. The two men argued, and Mr. Green claimed that the victim called someone on his cellular telephone during the argument and asked the person to "bring that burner thing."

3

Mr. Green "guess[ed]" that "burner thing" was a firearm. He said that the victim was unarmed and standing in the street "swing[ing] his hands" when the defendant aimed the gun and shot the victim.

The defendant testified that he had known the victim for "5 or 6 years" and during that time had known the victim to carry a weapon and be "a hot-headed type person." He said that after the dispute over the $50.00, the victim told him that he would "catch [him] in traffic," which the defendant interpreted to mean that the victim intended to kill him "or something." The defendant denied threatening the victim and specifically denied telling Ms. Murphy that he intended to arm himself and shoot the victim. He claimed that he merely told Ms. Murphy to tell the victim that he wanted his money back.

The defendant testified that late on the evening of March, 2, 2007, he was in front of his mother's residence talking to his nephew and some girls when the victim "pulled up on [him]." He said the victim immediately opened the truck door and they "had words [and] got to arguing back and forth" about the $50.00. According to the defendant, he asked the victim if he wanted to fight, and the victim responded that he did not but that they "can go to guns or something." The defendant claimed that after the victim mentioned guns, "he reached up under his seat as he was getting out," prompting the defendant to return to his own car and get a gun. The defendant said that he aimed the gun "low at the ground" and "shot [the victim] in his leg." He claimed that he purposely aimed low so as to scare the victim. He stated that he "really was not trying to shoot" but believed that the victim was reaching for a weapon. He admitted, however, that he never saw the victim in possession of a weapon.

The defendant testified that after being shot, the victim "got back in the car and left." He said that after the shooting, he went over to his "play auntie's house." He said that an individual he knew by the moniker "JoJo" had placed the weapon in his car and came to his "play auntie's house" to retrieve the weapon after the shooting. The defendant claimed that he did not know "JoJo's" first or last name.

Despite Ms. Murphy's testimony to the contrary, the defendant denied asking her to communicate a threat to the victim. In addition, despite Ms. Dillard's testimony to the contrary, the defendant maintained that he did not display a weapon prior to the victim's arrival at his mother's house.

During cross-examination, the defendant denied that "JoJo" had brought the gun to him for the purpose of confronting the victim and attributed its presence in his vehicle at the precise moment the victim arrived to happenstance. The defendant denied knowing the make and model of the weapon or even whether it was loaded when he retrieved it from the car. He said that he picked up his son and his "baby's mamma" from his "play auntie's house" and took them to his brother's house, where they all went to sleep for the night.

4

On this proof, the jury convicted the defendant of the lesser included offense of second degree murder. The trial court imposed a sentence of 23 years' incarceration.

(Doc. No. 57-11 at 1−5); *State v. Green*, No. M2010-01631-CCA-R3-CD, 2011 WL 2893088 (Tenn. Crim. App. July 20, 2011).

## B. Direct Appeal

The petitioner appealed, arguing that he was convicted based on insufficient evidence. (Doc. No. 57-9). The Tennessee Court of Criminal Appeals affirmed based on the following reasoning:

> The evidence adduced at trial established that the defendant and the victim had a dispute over $50.00. Several witnesses testified that the defendant stated his intent to kill the victim as soon as he could procure a weapon, and Ms. Dillard confirmed that the defendant displayed a firearm and stated his intent to use the weapon to confront the victim. During the argument, the defendant took time to step away from the victim, return to his car, and arm himself with a handgun before aiming it directly at the victim. The defendant admitted that he shot the victim during their argument over the money. This evidence adequately supports the defendant's conviction of second degree murder. Although the defendant claimed that he shot the victim in self-defense and that, in any event, he did not intend to kill the victim, the jury, as the trier of fact, was free to reject this testimony.

(Doc. No. 57-11 at 6).

The Tennessee Supreme Court denied permission to appeal. (Doc. No. 57-13).

## C. State Postconviction Review

The Tennessee Court of Criminal Appeals summarized the petitioner's postconviction proceedings in the trial court as follows:

> The Petitioner filed a pro se petition for post-conviction relief alleging multiple grounds of ineffective assistance of counsel and various due process and equal protection violations. After the appointment of counsel, an amended petition was filed also alleging that trial counsel was ineffective by failing to consult with him at critical stages of the criminal process and that he did not understand fully the nature and consequences of his decision to testify.
>
> At the post-conviction hearing, the Petitioner testified that he did not "feel comfortable" with trial counsel's representation. He said that counsel represented him for about one year and that he saw counsel once or twice during that time. Their

5

meetings occurred at the courthouse during scheduled appearances, and the Petitioner denied counsel came to the jail. The Petitioner denied counsel reviewed the State's discovery package, but he acknowledged receiving the discovery from a previous attorney. He denied counsel ever discussed the State's evidence and the witnesses' potential trial testimony, although the Petitioner "had an idea" of what the State's witnesses would say at the trial.

The Petitioner testified that he wanted trial counsel to interview Mr. Ali, who worked at or owned the store, but that counsel did not interview him. He said that to his knowledge, counsel did not hire an investigator. The Petitioner said Tyrez Johnson testified for the State and was inside the victim's truck. The Petitioner wanted counsel to cross-examine Mr. Johnson, but counsel did not question him. When asked why counsel did not question Mr. Johnson, the Petitioner said, "I guess [counsel] felt like he did a good job. That's what he . . . told me."

The Petitioner testified that trial counsel failed to cross-examine witnesses about their prior inconsistent statements. He said that Narkeetha Dillard told the detectives that before the victim left the truck, he reached under the seat but that counsel did not cross-examine her about what she saw. The Petitioner asked counsel to file a motion to suppress his police statement, but counsel did not file the motion. He said counsel initially said he would file the motion, but counsel did not discuss his reason for ultimately not filing it.

The Petitioner testified that he did not understand why the trial court classified him as a Range III offender and denied that trial counsel said the Petitioner could present witnesses at the sentencing hearing. He denied counsel explained enhancement and mitigating factors. He said counsel failed to inform him that the State could request the court to increase the Petitioner's sentence.

On cross-examination, the Petitioner testified that he had two attorneys before trial counsel, that he received the discovery package from one of the previous attorneys, and that the previous attorney did not review the materials with him. He agreed, though, that he read the materials. He thought it was possible that one of his attorneys filed a motion to suppress his video-recorded statement to the police and that the trial judge watched the video when the Petitioner was not in the courtroom to determine whether it should have been suppressed.

The Petitioner testified that trial counsel reviewed the case with him on the day of the trial and that counsel did not provide him enough time to understand what was happening. He denied knowing counsel subpoenaed the victim's medical records and said counsel never mentioned the State's offer to settle the case. He said that on the day of the trial, counsel asked if the Petitioner was going to testify and that the Petitioner replied, "Yeah." The Petitioner said, "[Counsel] just asked me was I getting on the stand. He didn't ask me whether or not I wanted to[.]" He thought counsel was telling him that he had to testify. He denied that he and counsel discussed the benefits and pitfalls of testifying. The Petitioner testified at the trial, and he told the jury he left the scene and went home after the "altercation." He said

6

the victim "was riding around looking" for him, "pulled up on [him]," and threatened him. The Petitioner said the witnesses who testified for the State were the victim's relatives and "in [the victim's] favor."

Upon questioning by the post-conviction court, the Petitioner agreed that his nephew testified for the defense. He agreed that his nephew testified that the victim pulled up in his truck aggressively, that the victim and the Petitioner argued, and that the victim called someone asking the caller to "bring that burner thing." He agreed the victim was unarmed standing in the street when the Petitioner shot him. He denied trial counsel explained that he had to testify in order for a self-defense jury instruction to be warranted. He did not recall the trial judge telling the jurors during jury selection that the Petitioner was not required to testify and that the jurors could not consider the Petitioner's decision not to testify in determining a verdict. He did not recall the judge's telling the jurors that the burden to prove the Petitioner's guilt was on the State.

The post-conviction court showed the Petitioner a motion to suppress the Petitioner's police statement that trial counsel filed on January 12, 2009, and the Petitioner denied ever receiving it. The court said a suppression hearing was held on February 4, 2009, and the Petitioner said he was not present for the hearing. The court said the prosecutor presented the recorded statement for the trial court's review without presenting witnesses. The court noted a written order was issued before the trial.

The Petitioner testified that although he told the jury his version of events, he did not "go into detail outside of [trial counsel's] questions." He agreed he told the jury that the victim reached under the truck seat, that the Petitioner felt as though he needed to get his gun, that the Petitioner aimed low at the ground, that the Petitioner did not aim to kill the victim, and that the Petitioner only wanted to scare him. He agreed this version of events was accurate.

Trial counsel testified that he had been licensed to practice law since 1975 and had practiced mostly criminal law. Counsel's representation began at the arraignment, and he agreed two previous attorneys withdrew because of conflicts of interest. He obtained funds for an investigator, Patrick Wells, and told the Petitioner to talk to Mr. Wells. He told the Petitioner that Mr. Wells was easier to contact and could come to the jail more frequently than counsel. He said Mr. Wells reviewed the discovery package with the Petitioner at the jail.

Trial counsel testified that he filed a motion to suppress the Petitioner's pretrial statement. He recalled the Petitioner said during the majority of the police interview that he was not present during the shooting. The police officer told the Petitioner that the interview was going to "start over," and that if the Petitioner was truthful, the officer would "forget" the denials. Counsel sought to prevent the jury from hearing the Petitioner's initial denial. He recalled that at the suppression hearing, the prosecutor presented the recording of the interview to the trial court for review without witness testimony.

7

Trial counsel testified that he understood the victim was not taken to a hospital immediately following the shooting but returned to a relative's house. Counsel was concerned that the unnecessary delay in medical treatment was an independent intervening "variable." Counsel subpoenaed the victim's medical records, and he reviewed them. He said the physicians told him that in all likelihood the victim would have died regardless of the delay in obtaining medical treatment because of the way the bullet entered the victim's body.

Trial counsel testified that the State offered to settle the case if the Petitioner pleaded guilty to second degree murder, although he could not recall if the offer was for twenty-five or thirty years at 100% service. Counsel conveyed the offer to the Petitioner, who believed he acted in self-defense because the victim came after the Petitioner. Counsel believed "supporting evidence" bolstered the Petitioner's self-defense claim. The Petitioner rejected the offer.

Trial counsel testified that he and the Petitioner discussed the benefits and pitfalls of testifying. He told the Petitioner that self-defense was an affirmative defense related to the Petitioner's state of mind and that the only way to present evidence of the Petitioner's state of mind was for the Petitioner to testify. He told the Petitioner that claiming self-defense required the Petitioner to tell the jury that he thought he was in imminent danger.

Trial counsel testified that multiple witnesses gave statements to the police, that the statements were recorded, and that Mr. Wells reviewed those recordings with the Petitioner at the jail. He recalled Mr. Johnson, the passenger in the victim's truck, testified at the trial that he begged the victim to leave before the shooting. Mr. Johnson testified that the victim was angry, was cursing, and was threatening the Petitioner, and counsel thought the testimony was beneficial to the Petitioner's self-defense claim. Counsel said that in light of the Petitioner's statement, the only possible theory was self-defense. Counsel agreed the Petitioner initially denied but ultimately admitted being at the scene. Counsel recalled that the incident between the victim and the Petitioner "cascad[ed] through the evening and . . . came to a head when" the victim came to the Petitioner's location, which was in front of the Petitioner's house, and challenged the Petitioner. He discussed those facts with the Petitioner, and they agreed this evidence was the only way to justify the shooting as self-defense.

Trial counsel testified that he told the Petitioner that a self-defense theory "necessitate[d] the defendant taking the stand and explaining . . . what he thought was happening that justified . . . taking that life." He said it was clear that the Petitioner had to testify in order to argue self-defense to the jury. He and the Petitioner discussed the possible questions he faced on cross-examination. He told the Petitioner that the prosecutor would ask questions about the witness who said the Petitioner retrieved his gun from his car. The Petitioner claimed the gun was in his belt and said the witness was wrong. Counsel said he always cautioned his clients that one of the pitfalls of testifying was the skill of the prosecutor and that a "cavalier statement" could be used against them.

8

Trial counsel testified that he did not recall the Petitioner's ever identifying potential witnesses, although he told his clients to tell Mr. Wells about anyone who might help the defense. He said Mr. Wells provided reports of his interviews and usually provided recordings unless someone objected to being recorded. Counsel reviewed the reports and any recordings before the Petitioner's trial. He also reviewed the detailed police reports.

On cross-examination, trial counsel testified that although he did not recall how long he represented the Petitioner, similar cases lasted about one to two years. He did not recall the number of times he met with the Petitioner at the jail but said his usual practice was to send Mr. Wells to the jail until close to trial. He said he began meeting with clients close to trial, which included meeting at the courthouse. Although counsel recalled Mr. Ali was a trial witness, he could not recall if Mr. Wells interviewed him. He said that Mr. Ali was not at the scene at the time of the shooting and that he might not have "keyed" on Mr. Ali. He thought Mr. Wells was unable to interview Mr. Johnson before the trial because Mr. Johnson, like the victim's family, did not want to talk to Mr. Wells. He thought Mr. Wells spoke to Ms. Dillard before the trial but was unsure. Counsel said he had Ms. Dillard's statement.

Trial counsel testified that he and the Petitioner discussed whether the Petitioner should testify at the trial. He told the Petitioner that if he wanted to argue self-defense, the Petitioner needed to testify. He did not have any reservations about the Petitioner's testifying and said the Petitioner was eager because he believed he acted in self-defense. Counsel told the Petitioner that he would permit the Petitioner to tell his story on direct examination and that the State would ask him questions on cross-examination. He told the Petitioner that the State would ask questions relative to the witness who stated the Petitioner retrieved his gun from his car. Counsel told the Petitioner to be prepared to address the issue, although counsel did not suggest the answers. Counsel could not tell the Petitioner every question the State might ask, but he provided the Petitioner with potential areas for questioning.

Trial counsel testified that the Petitioner did not express any reservations about his not cross-examining Mr. Johnson. Counsel said that in a break during the trial, he and the Petitioner discussed whether to question Mr. Johnson. Counsel thought Mr. Johnson said everything helpful to the defense during direct examination and did not want to provide Mr. Johnson an opportunity to "back up" on his testimony.

Trial counsel testified that his discussion with the Petitioner about the State's plea offer was short because the Petitioner was not interested in serving 100% of any sentence or in pleading guilty to any type of homicide. He said their discussion probably occurred when the case was scheduled for trial. He did not recall discussing a plea offer close to trial. Counsel said the Petitioner wanted a trial.

In a written order, the post-conviction court denied relief.

9

(Doc. No. 57-19 at 6−10); *Green v. State*, No. M2013-02840-CCA-R3-PC, 2014 WL 5502359 (Tenn. Crim. App. Oct. 31, 2014).

On appeal from the denial of postconviction relief, the petitioner argued that trial counsel was ineffective for failing to prepare the petitioner for trial, failing to interview Mr. Ali, failing to cross-examine Tyrez Johnson, failing to adequately cross-examine Narkeetha Dillard, and failing to explain the sentencing process to the petitioner. (Doc. No. 57-17 at 12−14).

The Tennessee Court of Criminal Appeals affirmed, concluding based on the evidence in the post-conviction record that trial counsel's performance was neither deficient nor prejudicial. (Doc. No. 57-19 at 12−14). The Tennessee Supreme Court denied permission to appeal. (Doc. No. 57-21).

### D. Federal Habeas Corpus Petition

The petitioner next filed a 28 U.S.C. § 2254 petition for writ of habeas corpus in this court. (Doc. No. 1). Proceedings were held in abeyance pending the Sixth Circuit's decision in *Henderson v. Mays*, Nos. 12-5028/14-5911, 2023 WL 3347496 (6th Cir. May 10, 2023). After this case was reopened, the petitioner filed an amended petition raising the following grounds for relief:

1) Trial counsel was ineffective for failing to request a jury instruction of "self-defense by duress." (Doc. No. 55 at 5).

2) Trial counsel was ineffective for failing to request a jury instruction of "self-defense by necessity." (*Id.* at 7).

3) Trial counsel was ineffective for failing to object to the composition of the petit jury based on Davidson County's alleged systematic exclusion of minorities. (*Id.* at 8).

4) Trial counsel was ineffective for failing to adequately prepare for trial. (*Id.* at 10).

5) Trial counsel was ineffective for failing to "provide disclosed evidence" including Narkeetha Dillard's statement to detectives. (*Id.* at 12).

6) Trial counsel was ineffective for failing to "call witnesses favorable to defense." (*Id.* at 13).

7) Trial counsel was ineffective for failing to contest the admission of the petitioner's confession as "involuntarily given and made under duress or coercion." (*Id.* at 15).

8) Trial counsel was ineffective for failing to impeach to Narkeetha Dillard with a prior inconsistent statement to defense investigator Patrick Wells. (*Id.* at 17).

9) The trial court "failed to give adequate weight to all mitigating factors" in violation of due process. (*Id.* at 19).

10) The petitioner was convicted based on insufficient evidence in violation of due process. (*Id.* at 20).

11) Trial counsel was ineffective for failing to "us[e] all the defenses to a homicide case" and "failing to cross examine and call favorable witnesses [such] as Narkeetha Dillard, Tyrez Johnson, [and Mr.] Ali." (*Id.* at 23).

12) Post-conviction counsel was ineffective for failing to call defense investigator Patrick Wells to testify at the post-conviction hearing. (*Id.* at 25).

13) The petitioner "had a right to stand [his] ground and not retreat from a perceived threat," and trial and post-conviction counsel were ineffective for failing to raise this issue. (*Id.* at 26).

14) The petitioner "shot one time to defend [his] family and [him]self," and trial counsel and post-conviction were ineffective for failing to raise this issue. (*Id.* at 28).

The respondent filed an answer (Doc. No. 58), and the petitioner did not submit a reply.

## II.  Governing Standards

A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). The Court sets forth the standards applicable to this Petition below.

### A.  Procedural Default

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b), thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (quotation marks and citations omitted). "To provide the State with the necessary 'opportunity,'

11

the prisoner must 'fairly present' his claim in each appropriate state court . . ., thereby alerting that court to the federal nature of the claim." *Id.* (citation omitted). In Tennessee, a petitioner is "'deemed to have exhausted all available state remedies for [a] claim'" when the claim is presented to the Tennessee Court of Criminal Appeals. *Adams v. Holland*, 330 F.3d 398, 401 (6th Cir. 2003) (quoting Tenn. Sup. Ct. R. 39). If a petitioner fails to properly exhaust a claim in state court, and the claim can no longer be raised in state proceedings because of a failure to follow state procedure for presenting such a claim, the claim is "technically exhausted" but procedurally defaulted. *Woodford v. Ngo*, 548 U. S. 81, 126 (2006).

A petitioner may obtain merits review of a procedurally defaulted claim by demonstrating "cause and prejudice" for the default. *Sutton v. Carpenter*, 745 F.3d 787, 791 (6th Cir. 2014). To establish cause, the petitioner must show that "some objective factor external to his defense impeded his ability to comply with the state's procedural rule." *Bies v. Sheldon*, 775 F.3d 386, 396 (6th Cir. 2014). In Tennessee and many other states, a petitioner who raises a procedurally defaulted claim alleging ineffective assistance of trial counsel may demonstrate cause by showing that postconviction counsel was ineffective for failing to raise the claim in initial state postconviction proceedings. *See Martinez v. Ryan*, 566 U.S. 1, 17 (2012) ("Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective."); *Trevino v. Thaler*, 569 U.S. 413, 429 (2013) (extending *Martinez* to states with procedural frameworks that make unlikely a meaningful opportunity to raise ineffective assistance claim on direct appeal); *Sutton*, 745 F.3d at 795−96 (holding that *Martinez* and *Trevino* apply in Tennessee).

To demonstrate cause under this framework, a petitioner must show that "the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Martinez*, 566 U.S. at 14. To establish prejudice under the "cause and prejudice" analysis, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quotation marks omitted)).

**B. Merits Review**

Under the AEDPA, a federal court may grant a writ of habeas corpus on a claim that was adjudicated on the merits in state court only if that adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Outside of unusual circumstances, the habeas court may not conduct an evidentiary hearing or consider facts outside the record presented in state court to adjudicate the merits of a petitioner's claim. 28 U.S.C. § 2254(e)(2); *Shinn v. Ramirez*, 596 U.S. 366, 371 (2022). This rule likewise applies to a petitioner's assertion of ineffective assistance of post-conviction counsel to excuse a procedural default. *Shinn*, 596 U.S. at 389.

If a claim was not adjudicated on the merits in state court, this Court applies the "pre-AEDPA standard of review: *de novo* for questions of law (including mixed questions of law and fact), and clear error for questions of fact." *Robinson v. Howes*, 663 F.3d 819, 823 (6th Cir. 2011); *see* 28 U.S.C. § 2254(e)(1).

### III.   Analysis

The respondent argues that Ground 12 is not cognizable on habeas corpus review, that several Grounds are procedurally defaulted, and that all the grounds lack merit. The court will address Ground 12, then the procedural-default argument, and finally the merits of the petitioner's remaining Grounds.

#### A.   Ineffective Assistance of Post-Conviction Counsel (Ground 12)

In Ground 12, the petitioner asserts that post-conviction counsel was ineffective in violation of the Sixth and Fourteenth Amendments. (Doc. No. 55 at 25). However, "[t]he ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254." 28 U.S.C. § 2254(i). Accordingly, the petitioner cannot obtain relief on this Ground.

#### B.   Procedurally Defaulted Grounds (Grounds 1, 2, 3, 7, and 9)

The respondent argues that Grounds 1, 2, 3, 7, and 9 are procedurally defaulted because the petitioner failed to present them to the Tennessee Court of Criminal Appeals on direct appeal or on appeal from the denial of his post-conviction petition.

The petitioner raised these Grounds in his pro se state post-conviction petition. (Doc. No. 57-14 at 25−41, 51−54, 56−57). In denying post-conviction relief, the trial court adjudicated all claims in the pro se petition and all claims in the amended petition that was filed by counsel. (*Id.* at 93 ("Petitioner raised multiple grounds in his *prose* petition; however, testimony was only elicited as to some of the claims. The Court shall only address the merits of claims where testimony was presented as the burden is on the Petitioner to establish his claims by clear and convincing evidence."), 100 ("Any grounds raised by Petitioner but not specifically addressed by this Order are found to be without merit.")). However, the petitioner did not present these Grounds

14

in his appeal from the denial of post-conviction relief. (*See generally* Doc. No. 57-17 at 10−15). They are therefore procedurally defaulted.

The petitioner does not assert any basis to excuse these procedural defaults, and none is apparent from the record before the court. Accordingly, the petitioner is not entitled to relief on these Grounds.

### C. Counsel's Failure to Prepare for Trial and Provide Discovery (Grounds 4 and 5)

In Ground 4, the petitioner asserts that trial counsel was ineffective for "fail[ing] to adequately prepare for trial." (Doc. No. 55 at 10). The amended petition offers no further elaboration on this Ground. (*Id.*) However, on post-conviction appeal, the petitioner raised a similar ground for relief and argued that trial counsel "did not prepare him for trial [] and did not explain the state's discovery with him in such a way that he understood it." (Doc. No. 57-17 at 12). Similarly, in Ground 5, the petitioner asserts that trial counsel was ineffective for failing to "provide disclosed evidence, as in Narkeetha Dillard's interview with Detectives." (Doc. No. 55 at 12).

The Tennessee Court of Criminal Appeals denied relief on this basis. (Doc. No. 57-19 at 13). The state court noted that trial counsel had hired an expert who met with the petitioner and reviewed the discovery materials with him. (*Id.*) And the petitioner conceded that he had reviewed the discovery materials. (*Id.*) For these reasons, the Tennessee Court of Criminal Appeals held that trial counsel's performance in this regard was neither deficient nor prejudicial. The petitioner has not shown that this holding was factually or legally unreasonable, so he is not entitled to relief on Ground 4 or 5. 28 U.S.C. § 2254(d).

To the extent the petitioner intends to assert that trial counsel was otherwise unprepared for trial, he has failed to set forth any factual basis for such a claim, so it is denied.

### D. Counsel's Failure to Call Favorable Witnesses (Ground 6)

In Ground 6, the petitioner asserts that trial counsel was ineffective for "fail[ing] to call witnesses favorable to [the] defense." (Doc. No. 55 at 13). The amended petition offers no further elaboration on this Ground. (*Id.*) However, on post-conviction appeal, the petitioner raised a similar ground for relief and argued that trial counsel was ineffective for failing to interview "Mr. Ali," who owned the store where the petitioner lost his $50. (Doc. No. 57-17 at 13).

The Tennessee Court of Criminal Appeals denied relief on this basis. (Doc. No. 57-19 at 13). Mr. Ali was not present at the time of the shooting, and petitioner did not present evidence at the post-conviction hearing regarding how Mr. Ali would have testified at trial. (*Id.*) For these reasons, the Tennessee Court of Criminal Appeals held that the petitioner had failed to demonstrate that counsel's performance was deficient or prejudicial. (*Id.*) The petitioner has not shown that this holding was factually or legally unreasonable, so he is not entitled to relief on Ground 6. 28 U.S.C. § 2254(d).

To the extent the petitioner intends to assert that trial counsel was ineffective for failing to call any witnesses other than Mr. Ali, he has failed to set forth any factual basis for such a claim, so it is denied.

### E. Counsel's Failure to Object to Introduction of Narkeetha Dillard's Prior Statement as Extrinsic Evidence and Failure to Impeach Narkeetha Dillard (Ground 8)

#### 1. Failure to Object to Use of Prior Statement as Extrinsic Evidence

In Ground 8, the petitioner asserts that trial counsel was ineffective for "fail[ing] to object [to] admission of the testimony of Narkeetha Dillard who made a[] prior inconsistent statement that was admitted as extrinsic evidence." (Doc. No. 55 at 17). The petitioner did not challenge this aspect of counsel's performance on post-conviction appeal (*see* Doc. No. 57-17), but the

16

respondent has not argued that it is procedurally defaulted. The petitioner did raise the same argument in his pro se state post-conviction petition:

> The petitioner was denied due process of law and deprived of his right to a fair trial because testimony of Narkeetha Dillard was improperly admitted as extrinsic evidence pursuant to Tennessee Rules of Evidence, Rule 613(b), of a prior inconsistent statement. The petitioner also submits that he received the ineffective assistance of counsel . . . because counsel failed to object to the admission of the testimony of Narkeetha Dillard.

(Doc. No. 57-14 at 17). The post-conviction trial court did not specifically address this claim, but explained that "[a]ny grounds raised by Petitioner but not specifically addressed by this Order are found to be without merit." (*Id.* at 100). This conclusion constitutes a merits adjudication of the petitioner's claim for Section 2254(d) purposes. *See Harrington v. Richter*, 562 U.S. 86, 100 (2011) ("[Section] 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'").

The state post-conviction trial court reasonably concluded that trial counsel was not ineffective for failing to object to the introduction of Ms. Dillard's prior statement as extrinsic evidence, because the statement was not in fact introduced as evidence. To be sure, the prosecution **sought** to introduce Ms. Dillard's prior statement. (Doc. No. 57-2 at 171−74). However, after a discussion between the prosecution, defense counsel, and the trial court, the prosecution ultimately used Ms. Dillard's prior statement only to refresh her recollection outside the presence of the jury. (Doc. No. 57-2 at 167−84). Accordingly, the petitioner is not entitled to relief on this aspect of Ground 8. 28 U.S.C. § 2254(d).

### 2. Failure to Impeach

Also in Ground 8, the petitioner asserts that trial counsel was ineffective for "fail[ing] to call investigator Patrick J. Wells who previously interviewed Ms. Dillard who admitted to him that prior to the shooting at the petitioner's residence the victim was at his truck and seemed to be

getting something before petitioner shot him, which was inconsistent to trial testimony."

(Doc. No. 55 at 17). The Tennessee Court of Criminal Appeals adjudicated this claim on post-conviction appeal:

> Relative to Ms. Dillard's alleged previous statement that she saw the victim reach under the seat of his car before the shooting, the record reflects that she testified at the trial that the Petitioner retrieved his gun from his car just before the shooting. At the postconviction hearing, trial counsel testified that he recalled Ms. Dillard was present during the shooting and that he had her statement before the trial. The Petitioner argues in his brief that counsel did not refute the Petitioner's claim that Ms. Dillard should have been asked about the prior inconsistent statement. However, post-conviction counsel never asked trial counsel about Ms. Dillard's making a previous statement in which she said the victim reached under the seat of his car before the shooting. The Petitioner had the burden of proving the allegation by clear and convincing evidence. *See* T.C.A. § 40-30-110(f). The record before this court does not contain evidence of such a previous statement, and no evidence was presented at the hearing regarding any potential deficiency.

(Doc. No. 57-19 at 14).

The Tennessee Court of Criminal Appeals reasonably held that without testimony from Mr. Wells or Ms. Dillard regarding the substance of Ms. Dillard's alleged prior statement, the petitioner had failed to demonstrate that trial counsel was ineffective for failing to impeach Ms. Dillard with that statement. Accordingly, the petitioner is not entitled to relief on this aspect of Ground 8. 28 U.S.C. § 2254(d).

Notably, in this court, the petitioner has submitted a written summary of Mr. Wells's pretrial interview of Ms. Dillard. (Doc. No. 50 at 29−30). The summary indeed indicates that Ms. Dillard told Mr. Wells that Mr. Ivory "was at his truck and seem[ed] to be getting something from his truck" before Mr. Green shot him.[1] (*Id.* at 30). However, this court's review of the state

---

[1] Contrary to the petitioner's assertion, trial counsel did ask Ms. Dillard whether she had told Mr. Wells the victim appeared to be getting something out of his truck. (Doc. No. 57-2 at 187−88). Ms. Dillard testified that she could not recall making such a statement. (*Id.* at 188).

18

court's adjudication is limited to the record before the state court. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011); *Shinn*, 596 U.S. at 371.

In any event, trial counsel successfully elicited similar testimony from another witness, Tameka Crawford. (Id. at 156) (Ms. Crawford acknowledging that she told Mr. Wells that "[w]hen Mr. Ivory exited his truck it appeared like he had retrieved something, but [she] could not tell whether or not it was a gun").

Moreover, it would have been extremely risky for trial counsel to call Mr. Wells to impeach Ms. Dillard, because in the same interview that the petitioner cites, Ms. Dillard stated that "Mr. William Green retrieved a gun from his car and commented that he had purchased the gun and showed the gun to Josh Green and commented he was going to kill Little Marvin [Ivory]. Mr. Green then put the gun in his car." (Doc. No. 50 at 29). At trial, Ms. Dillard did not testify about Mr. Green's comment that he was going to kill Ivory. (*See* Doc. No. 57-2 at 165) (Ms. Dillard responding "No" when asked if the petitioner said what he planned to do with the gun). If evidence of Mr. Green's comment that he intended to kill Mr. Ivory had been introduced at trial, not only would it have likely offset the benefit of Ms. Dillard's other prior statement, but it may also have persuaded the jury to convict the petitioner of first-degree murder instead of second-degree murder.[2] So, even if the petitioner's claim were before the court on *de novo* review, based on the evidence the petitioner has submitted, the court would not find that trial counsel was ineffective for failing to call Mr. Wells to impeach Ms. Dillard.

---

[2] As relevant here, first-degree murder requires intent and premeditation, Tenn. Code § 39-13-202(a)(1), while second-degree murder requires only a "knowing" killing, Tenn. Code § 39-13-210(a)(1). Two other witnesses testified at trial that on the day of the shooting, the petitioner had threatened to kill or shoot Mr. Ivory. (*See* Doc. No. 57-2 at 68) (Iris Murphy, Mr. Ivory's cousin, testifying that the petitioner had "told [her] that he was going to shoot [her] cousin"); (*id.* at 138) ("Tameka Crawford testifying that the petitioner had said someone "stole my $50.00 and if I see him I am going to pop him").

### F. Insufficient Evidence of Guilt (Ground 10)

In Ground 10, the petitioner asserts that "evidence was insufficient to prove that the defendant knowingly killed the victim." (Doc. No. 55 at 20). The Tennessee Court of Criminal Appeals adjudicated this claim on direct appeal:

> The evidence adduced at trial established that the defendant and the victim had a dispute over $50.00. Several witnesses testified that the defendant stated his intent to kill the victim as soon as he could procure a weapon, and Ms. Dillard confirmed that the defendant displayed a firearm and stated his intent to use the weapon to confront the victim. During the argument, the defendant took time to step away from the victim, return to his car, and arm himself with a handgun before aiming it directly at the victim. The defendant admitted that he shot the victim during their argument over the money. This evidence adequately supports the defendant's conviction of second degree murder. Although the defendant claimed that he shot the victim in self-defense and that, in any event, he did not intend to kill the victim, the jury, as the trier of fact, was free to reject this testimony.

(Doc. No. 57-11 at 6).

This adjudication was reasonable. There was ample evidence presented at trial for a finding that the petitioner knowingly killed Mr. Ivory. Accordingly, the petitioner is not entitled to relief on Ground 10.

### G. Counsel's Failure to Cross-Examine Tyrez Johnson (Ground 11)

In Ground 11, the petitioner asserts that trial counsel was ineffective for "not using all the defenses to a homicide case, failing to cross examine and call favorable witnesses [such] as Narkeetha Dillard, Tyrez Johnson, Ali who could [have] prove[n] [the petitioner] defended [him]self from risk of imminent death or serious bodily injury." (Doc. No. 55 at 23). This Ground is largely duplicative of other Grounds. (*See id.* at 5, 7 (failure to seek jury instructions for "self-defense by duress" and "self-defense by necessity"), 13 (failure to call purportedly favorable witness Mr. Ali), 17 (failure to impeach Narkeetha Dillard)). The only non-duplicative assertion is that trial counsel was ineffective for failing to cross-examine Tyrez Johnson.

The Tennessee Court of Criminal Appeals adjudicated this claim on post-conviction review:

> [T]rial counsel and the Petitioner discussed during a trial break whether counsel should cross-examine Mr. Johnson. Counsel concluded that Mr. Johnson's testimony on direct examination supported the self-defense theory. Further, counsel testified that the Petitioner did not express any reservation about counsel's not cross-examining Mr. Johnson. Counsel made an informed, strategic decision not to cross-examine Mr. Johnson because he feared Mr. Johnson would back away from his favorable testimony and provide unfavorable testimony if the prosecutor were permitted to question him further. The appellate courts will not second-guess trial counsel's informed tactical strategic decisions.

(Doc. No. 57-19 at 13) (citations and quotation marks omitted).

Indeed, although Mr. Johnson was a prosecution witness, his testimony was largely favorable to the petitioner. For example, Mr. Johnson described Mr. Ivory as the initial aggressor:

> Marvin kind of just he was not trying to hear too much about nothing about calling no truce or give me my money back or nothing like that though, do you feel me? It was more like fuck you, do you feel me? What is up, what do you want to do? I am here now. Like, you know, he was going looking for problems really though.

(Doc. No. 57-2 at 109).

Mr. Johnson also testified that Mr. Ivory was the first to mention a firearm during the argument with the petitioner:

> Little Green [was] cutting him off and trying to talk to me, try to give me a better understanding and I was listening at him and next thing you know uh, you know, Marvin got to talking about a pistol and all this and got on the phone and then I mean there was a lot of things, lot of stuff going on.

(*Id.* at 111); (*see id.* at 114) ("Marvin kept saying something about a pistol as if, you know, you better I mean so many words, you better have yours and I will be back with mine and you better pull yours out, before I pull mine out . . . . He was really like either you or me that is how Little Marvin was basically coming at him.").

Finally, Mr. Johnson testified that in the moments before the petitioner shot Mr. Ivory, Mr. Ivory continued to be aggressive, such that the petitioner likely felt threatened:

> [Mr. Ivory] hopped out and he was talking crazy and stuff, you know, and I was walking to Little Green at the time I walking to Little Green trying to talk, you know, trying to solve all of the problems, you know, just telling him give him a little time, you know, just trying to talk out of it, telling him to squash it and all that but, I mean when I hopped out the car Marvin hopped out the car, you know, kind of talking crazy to him which probably had Little Green feeling like, coming at him like I do not know.

(*Id.* at 115).

Indeed, Mr. Johnson was so helpful to the defense that trial counsel relied heavily on his testimony during closing argument. (Doc. No. 57-3 at 139−42).

The petitioner has not identified any additional helpful testimony that Mr. Johnson might have provided on cross-examination. Accordingly, he has failed to demonstrate that the Tennessee Court of Criminal Appeals' adjudication of this claim was unreasonable. He is therefore not entitled to relief on Ground 11. 28 U.S.C. § 2254(d).

**H. "Stand Your Ground" and "Defense of Another" Defenses (Grounds 13 and 14)**

In Ground 13, the petitioner asserts, "I had a right to stand my ground and not retreat from a perceived threat. I was at a lawful place which was my residence and was in imminent danger. My mother and nephew and house was in harm's way." (Doc. No. 55 at 26). In Ground 14, the petitioner asserts, "I was at my residence . . . as the victim pulls up aggressively in front of my house. While arguing with the victim my mother came to the porch. I armed myself in self-defense because the victim seemed to be searching his vehicle before exiting his truck. So I shot one time

to defend my family and myself." (*Id.* at 28). As to both Grounds, the petitioner asserts "Trial counsel and post-conviction counsel should [have] raised these issues." (*Id.* at 27−28).[3]

To the extent these Grounds are duplicative of Grounds 1 through 12, they are denied for the same reasons. To the extent these Grounds raise any new issues, they are procedurally defaulted because the petitioner did not raise them in state court.

In any event, it is not clear what the petitioner believes trial counsel should have done differently. The jury was instructed regarding self-defense, including that "[t]here is no duty to retreat before a person uses force." (Doc. No. 57-3 at 175). Moreover, there was no evidence, including the petitioner's own testimony, that the petitioner acted in defense of another. (*See* Doc. No. 57-3 at 97) (the petitioner testifying that he "truly believe[d] that Marvin Ivory was about to kill [him]," but not expressing a fear that Mr. Ivory would kill or injure any others). Accordingly, the petitioner is not entitled to relief on Grounds 13 and 14.

* * *

The petitioner's grounds for relief are all either procedurally defaulted or without merit. This court will therefore deny the petition for writ of habeas corpus and dismiss this action.

### IV. Requests for Sentence Reduction

During this litigation, the petitioner has submitted letters to the court seeking a sentence reduction or commutation. (Doc. Nos. 46, 62, 63). Absent a constitutional violation, which the petitioner has not demonstrated, the court is not authorized to modify the petitioner's sentence. 28 U.S.C. § 2254(a). These requests will therefore be denied.

---

[3] The respondent construes Grounds 13 and 14 as "freestanding claims" that the petitioner acted in self-defense or defense of another. However, viewing the petition in the light most favorable to the petitioner, these Grounds are better construed as alleging ineffective assistance of trial counsel.

The court recognizes and appreciates the petitioner's reported efforts "to grow into a more responsible and positive individual." (Doc. No. 62). The court notes with concern, however, that the petitioner has not demonstrated full acceptance of responsibility. Instead, in his court filings, he describes himself as "a brave young man who, facing unwarranted danger and unpredictable peril, defended himself in front of his own home and in the presence of his own family." (Doc. No. 57-14 at 23); (Doc. No. 50 at 2) ("The Petitioner knows in his heart he only stood his grounds and defended his family from harm's way."). Meanwhile, he describes Mr. Ivory as "a completely different individual who, despite having ample opportunity not to travel to the scene and despite having ample opportunity to simply drive away, lost his life through the tragic events of his own circumstances and by unfortunate actions of his own behaviors." (*Id.*).

The court hopes, for the petitioner's sake, that he will use his last few months of incarceration to accept full responsibility for his actions and to plan for a positive future in the community.

## V. Certificate of Appealability

Federal Rule of Appellate Procedure 22 provides that an appeal of the denial of a habeas corpus petition may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing § 2254 Cases requires that a district court issue or deny a COA when it enters a final order. A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). The district court must either issue a COA indicating which issues satisfy the required

24

showing or provide reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); Fed. R. App. P. 22(b). Here, no reasonable jurist would disagree that the petitioner's claims are procedurally defaulted or otherwise fail to demonstrate a basis for habeas corpus relief. This court will therefore not issue a certificate of appealability. Petitioner may seek a certificate of appealability in the Sixth Circuit if he chooses to appeal.

## VI. Conclusion

As discussed above, the Court **DENIES** Petitioner's 28 U.S.C. § 2254 petition for writ of habeas corpus and **DISMISSES** this action with prejudice. This court declines to issue a certificate of appealability. This is the final order in this case, and it denies all relief. Final judgment shall now issue. *See* Fed R. Civ. P. 58(b)(1)(C).

It is so **ORDERED**.

_____
Aleta A. Trauger
United States District Judge

25